IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NHS Youth Services, Inc.                    :
                                            :
              v.                            :
                                            :
Shamokin Area School District and the       :
Board of Directors of the                   :
Shamokin Area School District,              :   No. 1264 C.D. 2020
                         Appellants         :   Argued: December 16, 2021


BEFORE:    HONORABLE MARY HANNAH LEAVITT, Judge[1]
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                                 FILED: January 10, 2022


The Shamokin Area School District (District) and the District's Board of Directors (collectively, SASD) appeal from the Northumberland County Common Pleas Court's (trial court) November 18, 2020 order granting NHS Youth Services, Inc.'s (NHS) Motion for Partial Summary Judgment (Motion). SASD presents five issues for this Court's review: (1) whether the trial court erred by holding that enforcement of the alleged contract between NHS and SASD was an appropriate matter for mandamus relief; (2) whether the trial court erred by holding that the parties entered into a binding contract; (3) whether the trial court erred by concluding that an order entered in an earlier companion matter was controlling, despite that it was not a final order; (4) whether the trial court erred by granting partial summary judgment where there exist genuine issues of material fact; and (5) whether the trial court erred by ordering SASD to take all reasonable steps to collect

_____

[1] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

NHS's tuition payments without making findings of fact or conclusions of law concerning whether SASD has already made and exhausted reasonable efforts to do so. After review, this Court affirms.

NHS is a Pennsylvania non-profit corporation that operated Northwestern Academy (Academy), a juvenile justice complex for adjudicated delinquent and dependent youth in Northumberland County who typically struggle with behavioral health, drug and alcohol, and/or sexual offense related issues. The Academy is located within the SASD's geographic boundaries.

Pursuant to Section 1306 of the Public School Code of 1949 (School Code),[2] 24 P.S. § 13-1306, SASD was required to provide educational services to the adolescents who reside at the Academy. Section 1308 of the School Code, 24 P.S. § 13-1308, requires school districts whose students are residents at the Academy to make tuition payments for those students to SASD as the host school district. From the 2002-2003 school year through the 2012-2013 school year, SASD elected not to educate the Academy's students in its schools.

Rather, in 2003, SASD and NHS purportedly agreed that NHS would provide state-mandated education to the Academy's students on Academy grounds, thereby discharging SASD's statutory obligations (Contract). SASD Superintendent Gerald T. Nesvold (Nesvold) signed the Contract on February 10, 2003. Also, on February 10, 2003, Nesvold and NHS Senior Vice President Michael J. Breslin (Breslin) signed a First Addendum to the Contract, further defining NHS's duties (Addendum). *See* Reproduced Record (R.R.) at 57a-59a. Breslin signed the Contract on March 24, 2003. Attachment "A" to the Contract further defined SASD's and NHS's obligations with respect to billing and accounting, which included SASD providing a monthly status report to NHS. *See* R.R. at 55a-56a.

---

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 - 27-2702.

According to the Contract's and Addendum's terms, NHS would provide SASD with information necessary to establish students' tuition liability and allow SASD to obtain reimbursement from the students' home districts. The Contract required SASD to "promptly process all information received from [NHS] in order to promptly establish liability for tuition and in order to promptly secure reimbursement between school districts . . . ." R.R. at 51a. SASD was required to "pay to [NHS] the net funds received by [SASD] on account of the students residing at the [] Academy, after subtracting seven percent of such amounts . . . ." R.R. at 51a. The Contract further required SASD to "make such payments to [NHS] on a monthly basis, and [] include therewith a full accounting of the status of reimbursement billing and accounts with regard to each student." R.R. at 52a.

With respect to the Contract term, the Contract provided:

21. The commitments herein with regard to reimbursement between school districts and the commitments herein with regard to payments and subtractions between the parties to this [Contract] shall remain in effect until the final settlement and reconciliation of all payments and reimbursements between districts relating to the 2002-2003 school year. Any overpayment or underpayment between the parties shall be corrected through a reconciliation payment in accord with any adjustments of reimbursements between districts as calculated by the Pennsylvania Department of Education [(Department)].

22. It is the intent of the parties to enter into agreements for the 2003-2004 school year and for each year thereafter, subject to negotiations in good faith regarding the calculation of the amount to be subtracted by [SASD] when calculating net payments to [NHS]. The terms and conditions of this [Contract] shall remain in effect until such time as a new agreement is signed and executed, or until terminated by either party hereto on (60) sixty days written notice to the other party.

R.R. at 53a.

Further, paragraph 15 of the Addendum stated:

The term of [the Contract] shall be for a period of one year beginning July 1, 2002 and ending June 30, 2003. It is the intent of the parties to enter into agreements for the 2003-2004 school year and each year thereafter. The terms and conditions of [the Contract] shall remain in effect until such time as a new agreement or addendum thereto is signed and executed or until the [Contract] or this Addendum are terminated by either party hereto on sixty (60) days written notice to the other party.

R.R. at 59a.

## 2007 Action

In 2007, NHS filed an action against SASD for mandamus, breach of contract and specific performance (2007 Action).[3] NHS sought mandamus relief based on SASD's statutory obligation to provide for the Academy's students' education, and its Contract with SASD to provide the required educational services. On November 29, 2007, NHS filed a Motion for Peremptory Judgment (PJ Motion). Therein, NHS alleged that: SASD had received payments from both the Department and the students' home districts; SASD had deposited the funds in an escrow account; and SASD refused to pay NHS. On December 5, 2007, SASD filed its Answer to the PJ Motion. *See* R.R. at 542a-555a.

In the PJ Motion, NHS further averred, in relevant part:

10. Recognizing the treatment needs of the students at the Academy and seeking a cost effective and economical means of assuring the provision of mandatory educational services to students at the Academy, [SASD] contracted with NHS to provide educational services on the grounds

---

[3] Docketed at CV-07-1435. The 2007 Complaint is not part of the original record.

4

of the Academy to students committed to the Academy. . . .

[In its Answer to the PJ Motion, SASD admitted this allegation in part, stating in pertinent part: "It is admitted that [SASD] and NHS have entered into a contractual relationship for the education of incarcerated pupils at [NHS's] facility." R.R. at 558a.]

11. NHS, under the direction and supervision of [SASD], provides education services to adolescents from throughout Pennsylvania who are placed at the Academy.

[SASD answered: "Admitted." R.R. at 558a.]

12. NHS has provided and **continues to provide** mandated educational services **as specified under the** [C]ontract with [SASD].

[SASD answered: "Admitted." R.R. at 558a.]

13. [SASD] ha[s] charged, and continue[s] to charge, the school districts of residence of each of the Academy's students the mandated tuition and proportionate cost of the rental of the Academy's facilities and to receive payments from the school districts of residence.

[SASD answered, in pertinent part:

> Admitted in part and denied in part. It is admitted that [SASD] charges the home school districts of pupils incarcerated at the [] Academy rental fees and tuition. It is specifically denied that the rental payments are "mandated[].["] It is denied that [SASD] receives from the home school districts the rental payments it charges. [SASD] does charge the home school districts of the incarcerated pupils a "rental" fee at the behest of [NHS]. However, since the [Department] has declared that such charges are impermissible, some home school districts of incarcerated pupils, when billed by [SASD], pay the rental fee and others do not.

R.R. at 558a.]

5

14. The [C]ontract between [SASD] and NHS, at [p]aragraph 16, directs [SASD] to pay NHS the "net funds received by[ SASD] on account of the students residing at [the] Academy, after subtracting seven percent of such amounts, as payment in full for tuition and all other charges." The proportional rental charges [SASD] collects are specifically excluded from "the net funds received by[ SASD]" when it calculates the amount it may subtract for processing the tuition payments.

[SASD answered: "Admitted." R.R. at 559a.]

15. [SASD] does not dispute the calculation and amount of the tuition and the rental charges owed to NHS.

[SASD answered: "Admitted." R.R. at 559a.]

16. [SASD] dutifully collected the proportional rental charges from the school districts of residence and paid those amounts to NHS until September 2003.

[SASD answered: "Admitted." R.R. at 559a.]

. . . .

43. Specifically, [SASD] admit[s] that [it is] required to pay NHS tuition and rental costs for so long as [SASD] elect[s] to fulfill [its] statutory duty by contracting with NHS to provide educational services on behalf of [SASD] to students placed at the Academy.

[SASD answered: "Admitted in part and denied in part. It is admitted that [SASD] [is] required to pay to NHS the tuition costs and [is], in fact, doing so. It is denied that [SASD] [is] required to pay to NHS rental costs . . . ." R.R. at 564a.]

R.R. at 543a-544a, 548a (emphasis added).

On March 14, 2008, the trial court granted the PJ Motion (PJ Order). The trial court's PJ Order states, in relevant part:

1. The uncontroverted facts are that:

6

(a) [NHS] and [] [SASD] entered into a contractual relationship in 2003 for NHS to provide for the education of juvenile offenders committed to NHS.

(b) Section 1306 of the [School Code] . . . places initial responsibility for meeting the educational needs of the residents of the [Academy] upon the school district in which the said facility is located; therefore, SASD was to meet the educational needs of those juveniles placed at NHS.

(c) By virtue of the aforesaid contractual relationship, NHS fulfills SASD's statutory obligation as to the educational needs of these juveniles.

(d) Under Section 1308 of the [School] Code, 24 P.S. § 13-1308, the tuition of the juvenile offenders is the ultimate responsibility of the school district where the juvenile resided prior to commitment to the facility, payable to the host district (i.e.[,] SASD here).

(e) Thus, SASD is the conduit between NHS and the other school districts throughout this Commonwealth as to the tuition expense for the education of the juvenile offenders committed to NHS.

(f) The [C]ontract between NHS and SASD provides for the exchange of necessary information for the assessment of the reimbursement from the school district, and the arrangement for SASD to obtain the same with allowance for an administrative fee in connection therewith of seven percent.

(g) The [Contract] provided that NHS would be seeking reimbursement for tuition and also "lease rental payments to be included in the [i]nter-district tuition payments as permitted by [S]ection 1309(a)(1) of the [School Code, 24 P.S. § 13-1309(a)(1),] . . . [.]" (Paragraph 11 of the Contract).

(h) SASD has not disputed the calculation and amount of the tuition and rental charges owed to NHS under the said [C]ontract.

(i) SASD has obtained from the other school districts funds in fulfillment of their obligations under the [School]

7

> Code under the circumstances, as to which SASD has placed the same in escrow with interest pending a judicial determination as to the propriety of NHS charging a rental payment with the tuition.

R.R. at 61a-62a (footnote omitted). Accordingly, the trial court ordered SASD "to dissolve the escrow, to pay the funds held in escrow, with interest accrued thereon[,] to [NHS], after deduction of the administrative fee and interest thereon." R.R. at 65a.

On December 30, 2011, NHS filed a Motion to Enforce Final Judgment (Motion to Enforce). Therein, NHS averred that SASD "**contracted with NHS since February 2003** to have NHS educate the students under [SASD's] supervision at the Academy []." R.R. at 606a (emphasis added). SASD answered: "Admitted in [p]art. Both parties mutually entered in[to] the [Contract]." R.R. at 613a. NHS acknowledged that, following the PJ Order's issuance, SASD "dissolved the escrow, paid all the funds in the escrow to NHS[,] and generally complied with its contractual obligations as required under the law and [the PJ Order]." R.R. at 608a. Nonetheless, NHS alleged in the Motion to Enforce that, due to SASD's belief that lease costs should not be recoverable as part of tuition fees, SASD created another escrow account and expressed its intention to cease collecting lease payments.

On April 5, 2012, the trial court granted the Motion to Enforce (2012 Order), ordering that:

> (1) [SASD] shall fully comply with the terms of this [trial c]ourt's March 14, 2008 [PJ O]rder, including but not limited to the continued collection of lease payments from home school districts and prompt payment of those lease amounts upon receipt by [SASD] to NHS;
>
> (2) [SASD] shall dissolve any and all escrow accounts established by [SASD] that contain any funds received by [SASD] from home school districts or from the [Department] relating to tuition and/or lease payments and

8

shall pay all of such funds and accumulated interest thereon to NHS within 30 days of the date of this [o]rder;

(3) [SASD] shall provide NHS with a complete and accurate accounting of all tuition payments, including lease payments, by home school district[s] and the [Department], received by [SASD] since April 1, 2008[.]

R.R. at 67a-68a.

On May 25, 2018, NHS filed a Petition for Contempt (Contempt Petition) in the trial court. On July 25, 2018, SASD filed its response thereto. On October 4, 2018, SASD filed a Praecipe requesting that the trial court list the remaining non-mandamus claims for trial. On January 10, 2019, the trial court held a hearing on the Contempt Petition, which the trial court recessed for the parties to file briefs concerning the Contract's viability. Although both parties filed briefs, the trial court has not made a ruling in the 2007 Action.

**Instant Action**

On June 19, 2015, NHS filed a complaint in the trial court (Complaint) alleging breach of contract, and seeking mandamus relief and damages. NHS attached several exhibits to the Complaint including the Contract, the Addendum, the trial court's PJ Order and the 2012 Order. According to the Complaint, effective July 1, 2012, SASD assumed responsibility to provide special education services to eligible Academy residents, while NHS continued to provide regular education services to children at the Academy. Effective July 1, 2013, SASD assumed responsibility for providing both regular and special education services to all children at the Academy and, on that date, the parties entered into a lease agreement under which SASD would provide educational services at the Academy. NHS alleged in the Complaint that it seeks payments that SASD still owes NHS due to SASD's failure to comply with statutory and contractual duties to NHS. Such

9

obligations mandate that SASD pay NHS the full tuition and lease costs relating to educational services NHS provided to students who attended NHS's Academy pursuant to the Contract terms. The Complaint seeks unpaid tuition and related rental expenses, including allegedly withheld tuition payments SASD received from home school districts and the Department. On February 16, 2016, SASD filed its answer to the Complaint (Answer) denying all material allegations.

On May 30, 2018, NHS filed the Motion, and on September 25, 2018, NHS filed a memorandum of law in support thereof. Therein, NHS argued: (1) the Motion should be granted because SASD had failed to respond to the Motion; (2) res judicata and collateral estoppel barred SASD from challenging the Contract's validity or enforceability; and (3) SASD's failure to specifically deny NHS's allegations that SASD had failed to provide a required accounting and that SASD had received tuition payments owed to NHS constituted deemed admissions to those allegations. Thereafter, SASD filed a Memorandum in Opposition to the Motion (Memorandum in Opposition),[4] contending therein: (1) the Motion should not be granted for failure to file a timely response; (2) res judicata and collateral estoppel do not bar SASD from challenging the Contract's validity and enforceability and further challenging the re-issuance of an order in mandamus; and (3) SASD's general denials should not be deemed admissions.

On October 26, 2018, SASD filed its Answer and Supplemental Brief to the Motion (Motion Answer), with numerous documents attached thereto, including the October 4, 2018 deposition of SASD's Business Manager, Karen Colangelo (Colangelo), from the 2007 Action (Colangelo Deposition). In the Motion Answer, SASD responded to each of the Motion's allegations. SASD simply

---

[4] SASD's undated Memorandum in Opposition is in the Reproduced Record, but is not docketed. According to SASD, the trial court's prothonotary does not accept briefs, and accordingly, neither its brief nor NHS's brief is listed on the docket.

responded, "Admitted," with respect to paragraph 7 of the Motion, R.R. at 420a, which stated:

> NHS and SASD entered into a contractual relationship in 2003 for NHS to provide for the education of Academy [s]tudents . . . . *See* Exhibits "J" and "K" ¶ 1(a). A true and correct copy of the Contract between the parties, which is also an exhibit to the Complaint, is attached hereto as Exhibit "J."

R.R. at 19a. Notably, although SASD attached documents to its Answer, it did not include affidavits, certifications, or a signed verification.

On November 3, 2018, NHS filed a Supplemental Memorandum of Law in Support of the Motion (Supplemental Memorandum), attached to which were four exhibits, including the PJ Motion and SASD's Answer to the PJ Motion.

On November 18, 2020, the trial court granted NHS's Motion, finding:

> [T]he following facts are uncontroverted:
>
> 1. [NHS] and [SASD] entered into a binding written agreement in 2003 for [NHS] to provide education of juvenile offenders committed to NHS . . . .
>
> 2. SASD had a duty pursuant to Section 15 [of] the [Contract] to "take all reasonable steps to ensure that the [SASD] receives the maximum reimbursements between school districts allowed by the law[.]"[]
>
> 3. SASD had a duty pursuant to Section 16 of the [Contract] to pay [NHS] "the net funds received by [SASD] on account of the students residing at the [] Academy, after subtracting [seven percent (7%)] of such amounts, as payment in full for tuition and all other charges. It is understood and agreed that [SASD's] liability to [NHS] shall be strictly a pass through limited to reimbursement it receives from the resident's home district or the [Department], less [seven percent (7%)].["]
>
> 4. SASD had a duty pursuant to Section 18 of the [Contract] to make "payments to [NHS] on a monthly

11

basis, and shall include therewith a full accounting of the status of reimbursement billing and accounts with regard to each student."

5. SASD failed to provide [NHS] with an accounting required by paragraph 3 of the [trial c]ourt's . . . 2012 Order in the [2007 Action], which [directed] that "[SASD] shall provide NHS with a complete and accurate accounting of all tuition payments, including lease payments, by home school district and the [Department], received by [SASD] since April 1, 2008.["]

SASD Br., App. 1 at 1 (footnote omitted).

Based on those findings, the trial court ordered:

1. NHS is entitled to reli[ef] in mandamus and JUDGMENT IN MANDAMUS IS HEREBY ENTERED against [] SASD . . . and [it] shall:

   a. within twenty (20) days of the date of this [o]rder, dissolve any and all escrow accounts established by [SASD] that contain any funds received by [SASD] from home school district[s] or from the [Department] relating to NHS billings and shall pay all such funds, less [seven percent (7%)], and accumulated interest thereon to NHS;

   b. within twenty (20) days of the date of this [o]rder, provide NHS with a complete and accurate accounting of the following, for the time period January 1, 2003 to the present: (i) all billings that [it] received fr[]om NHS; (ii) all billings for tuition payments that is [sic] submitted to the [Department] or home school district[s]; (iii) all tuition payments it received from the [Department] or home school districts; and (iv) all tuition payments it remitted to NHS;

   c. within thirty (30) days of the date of this [o]rder, pay to NHS the sum equal to the difference between all tuition payments received and all tuition payments remitted, as set forth in subparagraph b. above, at (iii) and (iv)[;]

12

d. take all reasonable steps to collect tuition payments billed to [it] by NHS for which the [Department] or home school districts have not yet paid [it] until NHS is paid in full for all tuition that was billed to [SASD]; [SASD] shall contemporaneously document all such efforts;

e. beginning on [the] 5th day of February, 2021, and on or before[] the 5th day of each month thereafter[,] [SASD] shall make a full accounting of the status of reimbursement billing and accounts with regard to each student, and pay to [NHS] the sums received by [SASD] during the preceding calendar month as a consequence of billings to the [Department] or home school districts. The foregoing notwithstanding[,] the payment to be made on the 5th day of February, 2021, shall include all sums received by [SASD] as a consequence of billing to the [Department] or home school district[s] not previously remitted to [NHS].

*Id*. at 2. SASD appealed to this Court.[5]

Initially, the Pennsylvania Supreme Court has explained:

[S]ummary judgment is only appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. An appellate court may reverse a grant of

---

[5] Our review of a trial court's order granting summary judgment is *de novo*, and our scope of review is plenary; this Court applies the same standard for summary judgment as the trial court. Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

*Lancaster Cnty. Agric. Pres. Bd. v. Fryberger*, 257 A.3d 192, 199 n.13 (Pa. Cmwlth. 2021) (citations omitted).

summary judgment if there has been an error of law or an abuse of discretion. Because the claim regarding whether there are genuine issues of material fact is a question of law, our standard of review is *de novo* and our scope of review is plenary.

*Nicolaou v. Martin*, 195 A.3d 880, 891-92 (Pa. 2018) (citations omitted).

SASD first argues that the trial court erred by holding that the Contract's enforcement was an appropriate matter for mandamus relief. Quoting the Pennsylvania Supreme Court in *Commonwealth ex rel. Fortney v. Bartol*, 20 A.2d 313, 315 (Pa. 1941), SASD asserts that "even if there existed a contractual right (not reduced to judgment), the remedy would be limited to an action in assumpsit, because mandamus against public officials is available only for the enforcement of obligations imposed by law and not where the claim rests wholly on contract." SASD Br. at 13 (quoting *Fortney*, 20 A.3d at 315).

NHS retorts that SASD waived this argument because it failed to raise this issue before the trial court. Alternatively, NHS distinguishes *Fortney*, claiming that the Contract merely restates SASD's statutory obligation to provide education and seek reimbursement for that education and, thus, is subject to mandamus relief.

The law is well established that "a party has a duty to preserve an issue at every stage of a proceeding . . . [and] also must comply with the general rule to raise an issue at the earliest opportunity." *Campbell v. Dep't of Transp., Bureau of Driver Licensing*, 86 A.3d 344, 349 (Pa. Cmwlth. 2014). "Issues not raised at the earliest possible time during a proceeding are waived." *Grever v. Unemployment Comp. Bd. of Rev.*, 989 A.2d 400, 402 (Pa. Cmwlth. 2010).[6] "[A] non-moving party's failure to raise grounds for relief in the trial court as a basis upon which to deny summary judgment waives those grounds on appeal." *Harber Phila. Ctr. City*

---

[6] *Grever* was superseded on other grounds by Pa.R.A.P. 1513(d), as recognized in *Morgan v. Unemployment Compensation Board of Review*, 108 A.3d 181 (Pa. Cmwlth. 2015).

14

*Off. v. LPCI Ltd. P'ship*, 764 A.2d 1100, 1105 (Pa. Super. 2000). Thus, "arguments not raised initially before the trial court in opposition to summary judgment cannot be raised for the first time on appeal." *Devine v. Hutt*, 863 A.2d 1160, 1169 (Pa. Super. 2004). Here, SASD did not raise the argument that the alleged Contract's enforcement was an inappropriate matter for mandamus relief in either its Memorandum in Opposition or in its Motion Answer. Thus, SASD waived the issue.[7]

---

[7] Even if SASD had not waived this issue, this Court would find that *Fortney* is distinguishable, consistent with NHS's argument that the Contract merely restates SASD's statutory obligation to provide education services and seek reimbursement therefor.

Although not cited by NHS, its position is supported by the Pennsylvania Supreme Court's analysis in *Dombrowski v. City of Philadelphia*, 245 A.2d 238 (Pa. 1968), wherein the Court considered whether a former city employee with a vested right to retirement benefits had standing to pursue a mandamus action. The *Dombrowski* Court explained:

> The relevancy of Dombrowski's vested right and his contract with [the City of ] Philadelphia [(City)] as this bears upon his standing is illustrated by *Edelman v. Boardman, Secretary of Revenue*, . . . 2 A.2d 393 ([Pa.] 1938). Edelman brought a mandamus action in his own name to compel the Secretary of Revenue to escheat certain property so that [Edelman] could collect his informer's fee. We held that Edelman had standing ([*Id*.,] at 396): '**It is true that where the contractual obligation is one which is also imposed by law**, **it may be enforced by mandamus**, not because of the contract but in spite of it; **the party to the contract in such a case acquires an interest special to himself as distinguished from that of the general public**, **thus enabling him to bring the** (**mandamus**) **proceeding in his own name**.' **Similarly**, **Dombrowski's contractual relationship with the [C]ity stems from a duty imposed by law**, **i**.**e**., **the creation and administration of a retirement system**, and, as a party to the contract, he has standing.

*Dombrowski*, 245 A.2d at 245 (emphasis added).

Similarly, here, as NHS emphasizes:

> [T]he Contract simply restates SASD's statutory obligations to provide education [sic] and seek reimbursement for the education [sic], so the Court's entry of the order in mandamus relates to a statutory obligation, which is distinguishes [sic] the holding of [*Fortney*]. For example, Section 2 of the Contract states that the

15

SASD next argues that the trial court erred by holding that the Contract was binding and, assuming arguendo, that it was, the trial court erred by holding that the Contract extended beyond the 2002-2003 school year. In support of its position, SASD asserts that the Contract execution did not comply with Sections 427, 433, and 508 of the School Code, 24 P.S. §§ 4-427, 4-433, 5-508. Specifically, SASD contends that the Contract was not approved by a majority of school directors, and that the only vote on the Contract was a January 14, 2003 vote taken on the Addendum, not the Contract. Further, neither the Contract nor the Addendum contain statutorily required signatures. SASD also claims that the Contract's and Addendum's language is ambiguous with respect to the term during which it was in force.

NHS responds that SASD waived these issues because it is challenging the Contract's enforceability and term for the first time on appeal to this Court.[8] This

_____

Academy is "an 'institution for the care or training of children' for purposes of [S]ection 1306 of the [] School Code . . . ." [R.R. at] 47a[]. Sections 4, 5, and 6 of the Contract state that Section 1306 of the [] School Code places obligations on SASD with regard[] to educating student[s] located at the Academy and [] NHS will dispense with SASD's statutory obligation. [R.R. at] 48a[]. Sections 9, 10 and 11 of the Contract explain the information NHS will provide to SASD as required by the [] School Code to bill for its services and how under the [] School Code SASD will seek reimbursement for SASD's services. [R.R. at] 49a-50a[]. Thus, SASD['s] and NHS's obligations under the Contract are merely a recitation of the statutory obligations to provide education and the statutory ways to obtain reimbursement for NHS's services, which distinguishes the present situation from [*Fortney*].

NHS Br. at 37-38.

[8] Notably, SASD argued in the Memorandum in Opposition filed in the trial court that res judicata and collateral estoppel do not bar it from challenging the Contract's enforceability, but SASD did not argue to the trial court that the Contract was not binding. Accordingly, it did not raise the issues before the trial court that it now raises herein, i.e., that the Contract execution did not comply with the School Code and therefore, the Contract is unenforceable. NHS acknowledges that the issue was raised in a January 2019 hearing on its Contempt Petition in the

Court agrees. There is nothing in SASD's Memorandum in Opposition, or in its Motion Answer, alleging that the Contract is unenforceable for lack of School Code compliance or contracting authority. In fact, SASD **admitted** in paragraph 7 of the Motion Answer that "NHS and SASD entered into a contractual relationship in 2003 for NHS to provide for the education of Academy [s]tudents . . . ." R.R. at 19a, 420a.[9] Further, SASD did not challenge the term during which the Contract was in

_____

**2007 Action**, but emphasizes that was "long after the parties completed their briefing on the Motion" in the instant action.

[9] It is noteworthy that SASD repeatedly acknowledged the contractual relationship in numerous filings in the 2007 Action. NHS contends that those acknowledgments constitute judicial admissions and, because the PJ Order was based thereon, it cannot be overturned. Further, "SASD's judicial admissions in the 2007 Action that led to the entry of the [PJ] Order - that there was a binding contract - are conclusive admissions that cannot be subject to attack or reversed even if the 2008 PJ Order was not a final order." NHS Br. at 44.

> A [j]udicial admission is "an express waiver made in court or preparatory to trial by a party or his attorney, conceding for the purposes of trial, the truth of the admission," and may be contained in pleadings, stipulations and other like documents. . . . An important facet of such an admission is that it has been made for the advantage of the admitting party and once the admission has been made, the party making it is not allowed to introduce evidence attempting to disprove it.

*Lower Mount Bethel Twp. v. N. River Co., LLC*, 41 A.3d 156, 162-63 (Pa. Cmwlth. 2012) (quoting *Sherrill v. Workmen's Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 624 A.2d 240, 243 (Pa. Cmwlth. 1993)). Importantly, motions such as those in which SASD acknowledged the Contract's existence, are not pleadings. *See* Pa.R.Civ.P. 1017. Further,

> for an averment to be a judicial admission[:] [f]irst, the averment must be made in a verified pleading, stipulation, or similar document. Second, the averment must be made **in the same case** in which the opposing party seeks to rely upon it. In other words, an averment made in a pleading in an unrelated cause is not a judicial admission that precludes a party from contradicting that averment. Third, the averment must relate to a fact and not a legal conclusion. Fourth, the averment must be advantageous to the party [that] made it. Finally, the fact must be plausible.

*Branton v. Nicholas Meat, LLC*, 159 A.3d 540, 557 (Pa. Super. 2017) (emphasis added; footnote omitted).

17

force based on alleged Contract ambiguity. Accordingly, this Court concludes that SASD waived its arguments challenging the Contract's validity and term.

SASD next argues that the trial court erred by declaring that the PJ Order had preclusive effect in the instant action. SASD asserts that, although NHS argued to the trial court that the doctrines of collateral estoppel and res judicata bar SASD's challenge to the Contract's enforceability, rather than apply those doctrines, it appears the trial court concluded that the law of the case prohibited the trial court from making findings contrary to those in the PJ Order and, thus, dictated the Contract's viability.

> [T]his Court has long recognized that judges of coordinate jurisdiction sitting **in the same case** should not overrule each others' decisions. This rule, known as the "coordinate jurisdiction rule,"[10] is a rule of sound

---

[10] "[T]he Pennsylvania coordinate jurisdiction rule may be properly considered as part of the family of rules making up the law of the case doctrine." *Commonwealth v. Starr*, 664 A.2d 1326, 1332 (Pa. 1995).

> [The law of the case] doctrine refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

> The various rules which make up the law of the case doctrine serve not only to promote the goal of judicial economy . . . but also operate (1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end.

18

> jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency. *See . . . Golden v. Dion & Rosenau*, . . . 600 A.2d 568, 570 ([Pa. Super.] 1991) (once a matter has been decided by a trial judge[,] the decision should remain undisturbed, unless the order is appealable **and an appeal therefrom is successfully prosecuted**).

*Commonwealth v. Starr*, 664 A.2d 1326, 1331 (Pa. 1995) (emphasis added; citation omitted).

SASD posits that, because the PJ Order was an appealable order pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 311(a)(5),[11] and that order *could possibly* be successfully appealed, based on *Starr* and its reference to *Golden*, the law of the case does not apply. This Court disagrees that *Golden* stands for that proposition. Rather, it provides for situations where an interlocutory appeal is "successfully prosecuted." *Starr*, 664 A.2d 1331. SASD has provided no case holding that the mere possibility of a successful appeal serves to suspend the coordinate jurisdiction rule. Nonetheless, the coordinate jurisdiction rule applies to decisions in the "**same** case[.]" *Id.* (emphasis added). Here, the trial court incorrectly concluded it was bound by the PJ Order issued in a separate, albeit related, case.[12]

NHS argues that the trial court "properly held the [PJ] Order is a final order, making the [PJ] Order the law of the case, and prohibiting SASD's ability to challenge the [PJ] Order's effect in this case pursuant to the doctrines of res judicata

---

*Id.* at 1331 (citations omitted).

[11] Rule 311(a)(5) permits an appeal to be taken as of right from an order granting peremptory judgment in mandamus. Further, "failure to file an appeal of an interlocutory order [under subpart (a)(5)] does not waive any objections to the interlocutory order[.]" Pa.R.A.P. 311(g)(1).

[12] Notwithstanding that the trial court erred by concluding that the law of the case applied, this Court must still consider whether partial summary judgment was properly granted, i.e., whether genuine issues of material fact remain.

and collateral estoppel." NHS Br. at 17. Contrary to NHS's contention, the trial court did **not** "h[o]ld the [PJ] Order is a final order[.]" *Id.* Rather, in a footnote to its findings of the "uncontroverted" facts, it stated: "*See* [PJ Order]. This is the law of the case. [*Starr.*]" SASD Br., App. 1 at 1 n.1. Further, the trial court did not base its decision on the res judicata or collateral estoppel doctrines.

The Pennsylvania Supreme Court has explained:

Although the doctrines involve distinct considerations, res judicata and collateral estoppel both serve to preclude a party from pursuing litigation that revisits a claim or an issue that has been settled by a previous action, thereby preserving the interest in finality of judicial determinations, preventing endless litigation, and precluding parties from obtaining the proverbial "second bite at the apple." Relating to the preclusion of a *claim*, "[t]he doctrine of res judicata will preclude an action where the former and latter suits possess the following common elements: (1) identity of issues; (2) identity in the cause of action; (3) identity of persons and parties to the action; and (4) identity of the capacity of the parties suing or being sued." *Daley v. A.W. Chesterton, Inc.,* . . . 37 A.3d 1175, 1189-90 ([Pa.] 2012). The related but distinct doctrine of collateral estoppel precludes the subsequent litigation of an *issue* where:

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Taylor v. Extendicare Health Facilities, Inc.,* . . . 147 A.3d 490, 511 n.30 ([Pa.] 2016), . . . (quoting *Off*[.] *of*

> *Disciplinary Counsel v. Kiesewetter*, . . . 889 A.2d 47, 50-51 ([Pa.] 2005)).
>
> **Critically**, **neither res judicata nor collateral estoppel will preclude subsequent litigation if the prior action or ruling in question did not result in a final judgment**. "It is axiomatic that in order for either collateral estoppel or res judicata to apply, the issue or issues must have been actually litigated and determined by a valid and final judgment." *C[n]ty. of Berks ex rel. Baldwin v. Pa. Lab[.] Rel[s.] Bd.*, . . . 678 A.2d 355, 359 ([Pa.] 1996).

*In re Est. of Plance*, 175 A.3d 249, 270-71 (Pa. 2017) (bold emphasis added; italics omitted).

Even if this Court was to entertain NHS's contention, despite any such reliance on the doctrines by the trial court, it would find that the doctrines do not apply because it is not clear that the PJ Order was a final order. Rule 341 states, in relevant part:

> (b) **Definition of final order**. A final order:
>
> (1) disposes of all claims and of all parties;
>
> . . . .
>
> (3) is entered as a final order pursuant to paragraph (c) of this rule[.] . . .
>
> . . . .
>
> (c) **Determination of finality**.-- When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the trial court or other government unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered. In the absence of such a determination and entry of a final order, any order or other form of decision that adjudicates fewer than all the claims and parties shall not constitute a final order.

21

Pa.R.A.P. 341.

NHS contends that the 2007 Action's complaint (2007 Complaint) is not a part of the record, so there are no record facts to prove that the PJ Order did not dispose of all claims. Notwithstanding, the docket entries for the 2007 Action describe the action filed on August 13, 2007 as "Complaint for Mandamus, Specific Performance and Breach of Contract[.]" R.R. at 5a. NHS acknowledges that the 2007 Complaint "asserted three overlapping causes of action, all of which were founded on [SASD's] breaches of the [Contract]: (1) mandamus, (2) breach of contract - specific performance, and (3) breach of contract." NHS Br. at 19; *see also* R.R. at 522a.

> Nonetheless, NHS contends:
>
> The relief sought in each of the three counts of the 2007 Complaint are as follows: Count I – Mandamus – (a) dissolve the escrow, (b) pay the funds held in escrow with interest to NHS, and (c) pay NHS tuition and rental costs; Count II – Breach of Contract – Specific Performance – (a) dissolve the escrow, (b) pay the funds held in escrow, (c) comply with paragraphs 16, 18, and 20 of the Contract, and (d) pay NHS tuition and rental costs; and Count III – Breach of Contract – [] compensatory damages consisting of all rental payments collected but not paid to NHS and now held in escrow, including interest.

NHS Br. at 19-20. However, if NHS intended that the trial court be bound by the earlier decision based on res judicata or collateral estoppel, it was incumbent upon NHS, as the moving party, to demonstrate that the trial court was constrained due to a prior final order, and include the 2007 Complaint in the record, rather than argue that, because the 2007 Complaint is not in the record, SASD cannot prove that the doctrines **do not** apply. *See Day v. Volkswagenwerk Aktiengesellschaft*, 464 A.2d 1313, 1316 (Pa. Super. 1983) ("The burden rests upon the moving party to demonstrate clearly that there is no genuine issue of material fact. Summary judgment is properly granted on grounds of res judicata and/or collateral estoppel if

22

there is no genuine issue of material fact . . . .") (citations omitted); *see also D.Z. v. Bethlehem Area Sch. Dist.*, 2 A.3d 712, 731 (Pa. Cmwlth. 2010) ("A **party seeking to bar re-litigation of a claim must show** . . . (1) identity of the thing sued upon; (2) identity of the cause of action; (3) identity of the persons or parties to the action; and, (4) identity of the quality or capacity of the parties suing or sued.") (emphasis added). NHS did not meet its burden to show that the doctrines apply.

SASD next argues that the trial court erred by granting partial summary judgment when genuine issues of material fact remain in dispute. Specifically, SASD asserts that genuine issues of material fact remain with respect to whether SASD failed to provide an accounting to NHS, and whether SASD failed to remit all tuition payments it received to NHS.

NHS responds that SASD waived the argument that genuine issues of material fact remain, because it failed to raise the argument with the trial court, and failed to specifically identify the issues in its Concise Statement of Errors Complained of on Appeal (Rule 1925(b) Statement). NHS also contests SASD's Motion Answer's validity because it was unverified, did not contain counter affidavits, and did not include verified or certified copies of documents.

Given this Court's holding, herein, that SASD waived its argument challenging the existence and term of the Contract, this Court now considers whether genuine issues of material fact remain with respect to SASD's compliance with the Contract, the PJ Order, and the 2012 Order.

In addition to mandating that SASD fully comply with the PJ Order and dissolve any escrow accounts containing funds due NHS, the 2012 Order required SASD to "provide NHS with a complete and accurate accounting of all tuition payments, including lease payments, by home school district[s] and the [Department], received by [SASD] since April 1, 2008[.]" R.R. at 67a-68a.

23

In its Complaint, NHS alleged:

> Despite continued requests by NHS to SASD to finalize accounts between the parties regarding outstanding tuition and lease payments that SASD admits are owed to NHS under the [Contract], SASD has refused to remit payments that it owes to NHS and to provide NHS an accurate and ongoing accounting of other payments received (and payments not received) from home school districts that too are owed to NHS.

R.R. at 35a, ¶ 25. In its Answer, SASD responded:

> Denied. The averments of this paragraph contain certain conclusions of law to which no response is required. If it is judicially determined that a response is required, the same is denied with strict proof thereof demanded. By way of further answer, [SASD] is without sufficient knowledge, information or belief to form an opinion as to the truth of the averment which is therefore denied, and strict proof thereof is demanded.

R.R. at 74a, ¶ 25.

Pennsylvania Rule of Civil Procedure 1035.3, addressing responses to summary judgment motions, provides, in relevant part:

> (a) . . . [T]he adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response within thirty days after service of the motion identifying
>
>> (1) one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion, or
>>
>> (2) evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced.
>
> (b) An adverse party may supplement the record or set forth the reasons why the party cannot present evidence

24

essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence.

(c) The court may rule upon the motion for judgment or permit affidavits to be obtained, depositions to be taken or other discovery to be had or make such other order as is just.

(d) Summary judgment may be entered against a party [that] does not respond.

Pa.R.Civ.P. 1035.3 (Note omitted).

Further, Pennsylvania Rule of Civil Procedure 1035.4 states:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the signer is competent to testify to the matters stated therein. Verified or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

Pa.R.Civ.P. 1035.4.

In response to paragraph 20(a), (b) of the Motion, wherein NHS averred that SASD has failed to provide an accounting, and that SASD has received tuition payments from the Department and home districts that it has not remitted to NHS, SASD stated in its Motion Answer:

a. It is denied that [SASD] ha[s] failed to provide [NHS] with an accounting. Rather, [SASD] ha[s], in accord with the 2012 Order provided complete and accurate accounts to [NHS] of all tuition payments, including lease payments, by home school districts and [the Department], received by [SASD] since April 1, 2008. This information has been provided to [NHS] in the form of monthly and annual statements of billings showing the billing date, student name, sending district, educational classification, number of days billed, amount billed, education cost, 7% fee amount

25

and net due to [NHS]. These documents, all of which have been provided to [NHS] are thousands of pages in length. By way of example, the August 2012-2013 Reg[.] Ed[.] Billing statement for the 2012-2013 school year is attached hereto . . . . Additionally, [SASD] ha[s] provided [NHS] with a monthly statement, each and every month from April 1, 2008[,] to the present, of disbursements to [NHS] of funds received by sending districts. The documents are voluminous and, by way of example, the statement of disbursements for the period April 9, 2008 through May 13, 2008 is attached hereto . . . . By way of further answer, [SASD] ha[s] accounted to [NHS] for payments received from [the Department]. Such payments are for students deemed wards of the state as they have been disclaimed by sending districts. [The Department] may approve or disapprove billings for disclaimed students. [SASD] ha[s], since April 8, 2018[,] shared with [NHS] information for disclaimed students as well as those allowed or disallowed by [the Department]. See true and correct copy of 2009-2010 Disclaimed Students accounting and 2012 [Department] approval list attached hereto . . . .

b. Denied. [SASD] ha[s] released all escrow sums as required by the 2008 [PJ] Order. Additionally, [SASD] ha[s] paid to [NHS] all sums due [NHS] subsequent to the 2008 [PJ] Order and 2012 Order. [NHS] has asserted the existence of tuition payments received by [SASD] and not disbursed to [NHS]. [NHS] has provided no detail as to the nature and amount of such payments. Pursuant [to Pennsylvania Rule of Civil Procedure] 1035.2 (a)(2), [SASD] request[s] that the Honorable Court compel [NHS], within [60] days, to provide to [SASD] a specific explanation, including but not limited to the date and amount of the payment, student on whose behalf the payment was made and the payor, for each and every payment allegedly received by [SASD] but not disbursed to [NHS].

R.R. at 423a-425a (citation omitted).

Thus, in its Motion Answer, SASD denied the allegation in detail and referenced supporting exhibits. There was no requirement that SASD provide

26

*affidavits* to support that it disputed NHS's allegation. *See* Pa.R.Civ.P. 1035.3. Although the documents referenced and attached were not certified, they, along with purportedly thousands of other documents, were all produced to NHS as part of SASD's obligations under the 2012 Order.[13]

Importantly, the Colangelo Deposition, which SASD attached to its Motion Answer, *see* R.R. at 455a-507a, contains **testimony from SASD's own Business Manager that**, **despite SASD's aforementioned responses**, **supports NHS's assertions that some payments owed to NHS were <u>not</u> reported to NHS**, **have <u>not</u> been made thereto and thus**, **SASD did not comply with the PJ Order**. *See* NHS's Supplemental Memorandum, R.R. at 514a-519a. For example, Colangelo testified that, during certain years, SASD collected monies received for subject Academy students and deposited such in the SASD's general fund, rather than disbursing the funds to NHS because SASD could not identify the applicable students. *See* R.R. at 499a. Thus, it is clear that SASD failed to comply with the

---

[13] In its Rule 1925(b) Statement, SASD asserted: "[SASD] respectfully suggest[s] that the [trial c]ourt erred in entering summary judgment in favor of [NHS] and against [SASD] with respect to [NHS's] claims in mandamus[,] as there exist genuine issues of material fact." R.R. at 13a, ¶ 1. Further,

> [SASD] respectfully suggest[s] that the [trial c]ourt erred in directing that [SASD] "take all reasonable steps to collect tuition payments billed to [it] by NHS for which the [Department] of [sic] home school districts have no [sic] yet paid [it] until NHS is paid in full for all tuition that was billed to [SASD] . . ." without making findings of fact or [conclusions of] law concerning whether [SASD] ha[s] already made and exhausted reasonable efforts to make collection on the billed tuition payments.

R.R. at 14a, ¶ 5. Although NHS contends that these statements are insufficiently specific, SASD's Rule 1925(b) Statement responded to the trial court's two-page order, which did not explain in significant detail its reasons for its factual findings and legal determinations. The trial court did not otherwise issue an opinion in support of that order. Under these circumstances, SASD's Rule 1925(b) Statement was sufficient.

Contract terms and the PJ Order. Accordingly, the trial court properly granted partial summary judgment.

Finally, SASD contends that the trial court erred by ordering SASD to take all reasonable steps to collect NHS's tuition payments, without making findings of fact or conclusions of law concerning whether SASD has already made and exhausted reasonable efforts, and imposed on SASD an obligation to indefinitely engage in debt collection activity.

The trial court was clear when it stated:

> SASD failed to provide [NHS] with an accounting required by paragraph 3 of the [trial c]ourt's . . . 2012 Order in the [2007 Action], which required that "[SASD] shall provide NHS with a complete and accurate accounting of all tuition payments, including lease payments, by home school district[s] and the [Department], received by [SASD] since April 1, 2008.["]

SASD Br., App. 1 at 1. Accordingly, the trial court ordered SASD to take the steps necessary to identify monies collected and due to NHS, and provide NHS with an accounting. The trial court's charge is not an indefinite obligation. Rather, it is an obligation that SASD fulfill its statutory and contractual obligations to NHS.

For all of the above reasons, the trial court's order is affirmed.


_____
ANNE E. COVEY, Judge

28

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

NHS Youth Services, Inc.         :
                                 :
          v.               :
                                 :
Shamokin Area School District and the  :
Board of Directors of the          :
Shamokin Area School District,     :   No. 1264 C.D. 2020
              Appellants     :

## O R D E R

AND NOW, this 10th day of January, 2022, the Northumberland County Common Pleas Court's November 18, 2020 order is affirmed.

_____
ANNE E. COVEY, Judge